[Cite as *State v. Dye*, 2014-Ohio-1067.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 13AP-420 |
| | | (C.P.C. No. 12CR-777) |
| Rickey A. Dye, | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on March 20, 2014

*Ron O'Brien*, Prosecuting Attorney, and *Steven L. Taylor*, for appellee.

*Yuera R. Venters,* Public Defender, and *John W. Keeling*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

CONNOR, J.

{¶ 1} Defendant-appellant, Rickey A. Dye, appeals from a judgment of the Franklin County Court of Common Pleas, convicting him of two counts of aggravated burglary, one count of rape, two counts of kidnapping, and one count of abduction.

 I. Facts and Procedural History

{¶ 2} In 2011 and 2012, appellant and his victim, 65-year-old Janice Beight, were co-workers at a homeless shelter for women, known as "Rebecca's Place."  The two never got along well.  According to Beight, in both November and December 2011, appellant made lewd remarks to her of a sexual nature.  In December 2011, appellant called Beight at home and accused her of stealing one of the Victoria's Secret gift bags donated to the residents of the shelter. Shortly thereafter, Beight sent an e-mail to her supervisor

complaining of the lewd sexual remarks appellant made to her earlier that month. Appellant's employment was terminated as a result of the complaint.

{¶ 3}  Beight's trial testimony reveals the following sequence of events. On February 2, 2012, at approximately 10:20 p.m., appellant showed up unexpectedly at her doorstep as she was leaving her apartment to go to the pharmacy.  Appellant forced his way into the apartment, pushed her into a closet door, ripped her purse from her hands and ordered her to sit down.  Appellant proceeded to berate her about making a sexual harassment complaint that caused him to lose his job and his wife.  Appellant told her that he had no money, nowhere to live, and that he was sleeping in his car.  Beight told the jury that she became frightened when appellant shouted "I have nothing to lose." (Vol. I, Tr. 73.)

{¶ 4}  Beight testified that appellant continued to berate her as he paced back and forth in her living room for approximately one hour.  When she offered to give appellant $80 that she kept in the apartment, appellant followed her down the hallway to the back bedroom.  After she gave appellant $80, he forced her into a second bedroom where he threatened her with a wallpaper cutter and ordered her to disrobe.  Appellant then ordered Beight to get on the bed.

{¶ 5}  According to Beight's trial testimony, appellant unzipped his pants and climbed on top of her.  Appellant then used the scarf Beight had been wearing to strangle her as he raped her vaginally.   Appellant eventually ceased his assault and allowed her to use the inhaler she kept in the nightstand.   At trial, Beight testified that she did not believe appellant used a condom during the attack.  When the prosecutor asked Beight whether appellant ejaculated, she answered "I believe he did." (Vol. I, Tr. 84.)

{¶ 6}  Beight told the jury that after he had raped her, appellant used the wallpaper cutter to shred her bed sheet into strips that he used to tie her ankles together and her hands to the bed posts.  After appellant secured Beight to the bed, he hit her on the nose and forehead with a single, closed-fisted blow.  Appellant then left the apartment.

{¶ 7}  With blood running from her nose, Beight was able to untie her hands from the bed posts in relatively short order but she was unable to remove the bindings from her ankles. According to Beight, her struggle to untie the bindings exhausted her and that she

may have passed out. When she awoke the next morning, Beight managed to throw herself off the bed and crawl to the other bedroom where she used a pair of scissors to cut the bindings on her ankles.

{¶ 8}  Beight discovered that her purse and her cell phone were missing, so she used her land line to report the crime.  Columbus police officers arrived shortly thereafter along with medical personnel who transported Beight to the hospital.  Dr. Ann Marie Robinson was the attending physician on duty that morning.  Her physical examination of Beight revealed the presence of dried blood in the nostrils, a bruise on the right side of her forehead, and multiple bruises and abrasions on her wrists and ankles.  Robinson testified at trial the abrasions on Beight's wrists could be consistent with restraint.

{¶ 9}  Beight was also examined by Breanne Duke, a Sexual Assault Nurse Examiner, who observed the following injuries: a bruise on Beight's right upper arm; a small bruise on her right upper thigh; an area of redness and abrasion on her ankles; a small area of redness on her right big toe; a small area of redness on her neck; some bruises on her back; and a 16 centimeter area of redness around her neck.  An examination of Beight's genital area revealed no tears, lacerations, erythema abrasions, redness, or swelling that could be observed externally.  However, an internal examination revealed a bruise on the clitoral hood, four abrasions in the vaginal area, and redness and abrasion of the cervix.  Nurse Duke employed a rape kit to obtain vaginal swabs and smears which were to be used to detect the presence of semen and foreign DNA.  She also passed a "Wood's lamp" over Beight's entire body looking for signs of dried semen, but none was detected.

{¶ 10} Based upon the information provided by Beight, Columbus police located appellant and arrested him at 10:30 p.m. on February 3, 2012, as he slept in his parked car.  Although police found none of Beight's missing property in the search of appellant's vehicle, they recovered a utility knife that matched Beight's description of the wallpaper cutter used by appellant in the commission of the crime.  Appellant's clothing was not tested for the presence of DNA.

{¶ 11} The Franklin County Grand Jury indicted appellant on two counts of aggravated burglary, one count of rape, two counts of kidnapping, and one count of abduction.  The jury found appellant guilty of all six counts in the indictment.  The trial

court found appellant guilty of the repeat violent offender specification but not guilty of the sexually violent predator specification. On April 26, 2013, the trial court issued a final judgment entry convicting appellant of all six counts and the specification and sentencing him to 28 years in prison. Appellant filed his notice of appeal to this court on May 20, 2013.

## II. Assignments of Error

{¶ 12} Appellant assigns the following as error:

[I.] THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE CONVICTIONS.

[II.] THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

[III.] THE TRIAL COURT ERRED WHEN IT REFUSED, AT THE REQUEST OF THE DEFENDANT, TO DETERMINE IF ANY OF THE JURORS HAD BEEN EXPOSED TO A NEWSPAPER ARTICLE THAT RELATED PREVIOUS CONVICTIONS OF THE DEFENDANT.

[IV.] THE TRIAL COURT ERRED WHEN IT ALLOWED THE SEXUAL ASSAULT NURSE TO TESTIFY, OVER OBJECTION, THAT THE COMPLAINANT'S ACCOUNT OF THE RAPE HAD AFFECTED THE NURSE EMOTIONALLY, JUST FROM THE SECONDARY TRAUMA OF HEARING IT, AND THAT IT HAD CAUSED HER TO HAVE NIGHTMARES AND THAT IT WAS ONE OF THE WORST INCIDENTS OF HER 150 TO 200 SEXUAL ASSAULT EXAMINATIONS THAT SHE HAD EVER ENCOUNTERED.

## III. Legal analysis

## A. Sufficiency and Weight of the Evidence

### 1. Standard of Review

{¶ 13} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). We examine the evidence in the light most favorable to the state and conclude whether any rational trier of fact could have found that the state

proved, beyond a reasonable doubt, all of the essential elements of the crime. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus; *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 78; and *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396.

{¶ 14} In determining whether a conviction is based on sufficient evidence, an appellate court does not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. *See Jenks*, paragraph two of the syllabus; *Thompkins* at 390 (Cook, J., concurring); *Yarbrough* at ¶ 79 (noting that courts do not evaluate witness credibility when reviewing a sufficiency of the evidence claim). We will not disturb the verdict unless we determine that reasonable minds could not arrive at the conclusion reached by the trier of fact. *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001); *Jenks* at 273. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Thompkins* at 386.

{¶ 15} While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25, citing *Thompkins* at 386. Under the manifest weight of the evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive - the state's or the defendant's? *Id.* at ¶ 25. Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *see also State v. Robinson*, 162 Ohio St. 486 (1955) (although there is sufficient evidence to sustain a guilty verdict, a court of appeals has the authority to determine that such a verdict is against the weight of the evidence); *State v. Johnson*, 88 Ohio St.3d 95 (2000).

{¶ 16} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Wilson* at ¶ 25, quoting *Thompkins* at 387. In determining whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving any conflicts in the

evidence, the jury clearly lost its way and thereby created such a manifest miscarriage of justice that the conviction must be reversed and a new trial must be ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 17} A conviction should be reversed on manifest weight grounds only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175. Moreover, " 'it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.' " *State v. Brown*, 10th Dist. No. 02AP-11, 2002-Ohio-5345, ¶ 10, quoting *State v. Long*, 10th Dist. No. 96APA04-511 (Feb. 6, 1997).

{¶ 18} In appellant's first and second assignments of error, he advances two related evidentiary challenges to his convictions. First, appellant contends that Beight's testimony is so unworthy of belief that it is legally insufficient to convince a rational trier of fact that appellant perpetrated the crimes against her. Second, appellant claims that, in the absence of DNA evidence, the State failed to produce sufficient evidence to convince a rational trier of fact that Beight was the victim of rape. Accordingly, we will consider appellant's first and second assignments of error together.

{¶ 19} When we examine the evidence introduced at trial in the light most favorable to the State, it is clear that a rational trier of fact could have found that the State proved all of the essential elements of the offenses, beyond a reasonable doubt. Indeed, Beight's testimony as set out above, if believed, establishes appellant's guilt as to each of the offenses for which the jury found him guilty. Appellant argues, however, that the "physical facts rule" rendered Beight's testimony legally insufficient to support his convictions. Under the physical facts rule, the testimony of a witness is not entitled to any probative value where the physical facts positively contradicted the testimony. *State v. Nick*, 10th Dist. No. 12AP-845, 2013-Ohio-3453, ¶ 14, citing *McDonald v. Ford Motor Co.*, 42 Ohio St.2d 8, 12 (1975).

{¶ 20} Appellant argues that the jury lost its way when it elected to believe Beight's testimony that he committed the crimes against her given the irrefutable proof that Beight had a motive to falsely accuse him. Appellant maintains that Beight's lack of credibility is further evidenced by the fact that no male DNA was recovered in the investigation even

though Beight's statements to investigators establish that such evidence was left at the scene.

{¶ 21} Appellant finds support for his arguments in Nurse Duke's testimony. Duke testified that as she examined Beight at the hospital, Beight told her that appellant ejaculated during the commission of the rape. According to appellant, if the perpetrator had ejaculated during the commission of the crime, seminal fluid should have been recovered either by Columbus police in their crime scene investigation or by Nurse Duke during her examination of Beight's person. Appellant argues that the absence of DNA evidence proves that Beight lied about the attack. We disagree.

{¶ 22} First, appellant's assertion that the investigation uncovered no male DNA is inaccurate. Adam Garver, a forensic scientist with the Criminal Bureau of Investigation testified at trial in the State's case-in-chief. According to Garver, a scientific test performed on the scarf used to choke Beight revealed the presence of "touch DNA" matching appellant's profile. According to Garver, 1 out of every 243 males has such a profile.

{¶ 23} Additionally, Sarah Glass, a forensic scientist with the Criminal Bureau of Investigation, testified that she performed STR testing on the vaginal swab used to collect the fluid from Beight's cervix. According to Glass, the test yielded a positive result for prostate specific antigen ("PSA"), a component of male seminal fluid. According to Glass, the PSA concentration found in the fluid collected on the vaginal swab was greater than that one would expect to find if a female had been the donor. For this reason, Glass sent the sample to Garver for him to conduct the male specific Y-STR test.

{¶ 24} Garver performed the Y-STR test on the vaginal swab used to collect the fluid from Beight's cervix. A "Y-STR test" is designed to detect the presence of male specific DNA in fluid while ignoring the presence of female DNA. (Vol. III, Tr. 13.) The results of the test revealed no sperm cells and no male DNA that could be matched to any specific donor, including appellant. In short, while appellant is correct in his assertion that DNA testing of the vaginal swab failed to implicate him in the crime, he is mistaken in his claim that the test ruled out the presence of male DNA. Contrary to appellant's assertions, this is not a case where the physical facts contradict the victim's testimony.

{¶ 25} Moreover, appellant's attack upon Beight's credibility discounts her trial testimony.  At trial, Beight stated that she believed appellant ejaculated during the attack.  Her uncertainty on this issue is consistent with her testimony regarding the events that occurred during the attack.  For example, Beight told the jury that appellant unzipped his pants just prior to the rape but that he did not remove them during the commission of the rape.  Beight also told the jury that she never saw appellant's genitals at any time during the attack.

{¶ 26} The "trier of fact is free to believe or disbelieve all or any of the testimony and is in the best position to take into account inconsistencies, as well as the witnesses' manner and demeanor, and to determine whether the testimony is credible." *State v. Peterson,* 10th Dist. No. 07AP-303, 2008-Ohio-2838, ¶ 83, citing *State v. Sevilla,* 10th Dist. No. 06AP-954, 2007-Ohio-2789, ¶ 13.  Therefore, we must give great deference to the fact finder's resolution of alleged inconsistencies in witness testimony.  *State v. English*, 10th Dist. No. 13AP-88, 2014-Ohio-89, ¶ 22, citing *State v. Spires*, 10th Dist. No. 10AP-861, 2011-Ohio-3312, ¶ 18.  In this instance, Beight's trial testimony provides a plausible explanation for her uncertainty whether appellant ejaculated during the rape.  In other words, her trial testimony is not necessarily inconsistent with the virtual absence of seminal fluid at the scene.

{¶ 27} The same is true of the evidence suggesting that Beight had a strong motive to falsely accuse appellant.  According to appellant, his accusation that she had stolen the gift bag was Beight's third such transgression and that he had caused her to fear for her job.  Indeed, in an effort to establish her bias against appellant, defense counsel cross-examined Beight about each of the prior incidents.  Beight acknowledged that there was an incident where she took four cookies home with her from the workplace and another incident where she took six candy bars from a Halloween gift basket.  She explained that the incidents were "honest mistakes" inasmuch as she believed she had permission to take the items.  (Vol. II, Tr. 20.)  Beight testified that she discussed each of the issues with her supervisor and that she provided an explanation for each occurrence.  Beight admitted to her supervisor that she was "not a perfect employee or human being"; that she had been disciplined pursuant to her employer's progressive discipline policy; and that termination of her employment was a "possibility." (Vol. II, Tr. 20.)  However, when asked about the

discipline she faced regarding the gift basket, Beight testified: "My job was never in jeopardy at any time." (Vol. II, Tr. 22.)

{¶ 28} Our review of the totality of the evidence leaves us with little doubt that Beight was the victim of a violent attack at her apartment on February 2, 2012, and that the assailant left her tied up and badly beaten. Beight's physical injuries and the evidence obtained at the scene of the crime corroborate her testimony in this regard. Thus, it was for the jury to assess Beight's credibility and decide whether Beight elected to falsely accuse appellant of the crime rather than to report accurate information about her attacker. We cannot say that the jury lost its way in assessing Beight's credibility and in finding appellant guilty of all charges. For the foregoing reasons, appellant's first and second assignments of error are overruled.

## B. Prejudicial Publicity

{¶ 29} In appellant's third assignment of error, appellant contends that a newspaper article that appeared in the Columbus Dispatch potentially prejudiced the jury against defendant inasmuch as the article revealed information about his prior convictions. The parties had agreed that they would keep such information from the jury. Appellant's trial counsel asked the court to voir dire the jury to determine whether any of the jurors had seen the article. The trial court refused the request but did give the following admonition to the jury:

> THE COURT: Members of the jury, you'll notice there's a large camera at the end of the jury box this morning. That is here from one of the local television media outlets. Don't let it distract you. They will not show any faces or any information about the jury. That's the rule in Ohio, and that's what they'll obviously follow.
>
> In addition, because of the nature of the case, they aren't planning to show the face of the witness who is coming back from cross-examination this morning, Ms. Beight.
>
> The other thing I wanted to talk about was the fact that I understand there might have been some other news media reports about this case. You are not to pay any attention to anything that's in either the print media or the electronic media during the course of this trial. That, again, falls into the category of information from outside the courtroom.

News media, as you'll appreciate, try to do a sensible job and try to cover accurately what happens in our courthouse, because this is a public facility and you're public jurors this week, but they don't cover the whole trial like you do. You sit here and listen to everything start to finish, see it all, know it all.

That's why we want you insulated from other sources so you decide it strictly on the basis of what happens in this courtroom and not on the basis of a snippet that may appear in the news media, which may or may not be accurate. They may hear something wrong or they might write only part of an answer by a witness. Or they may have records – information provided to them that's totally inaccurate and that, in fact, isn't admissible because it is inaccurate in the report, see.

If you see any references on TV, the standard instruction judges ask you to do is to get up and leave the room until that little segment of the news is over.

And if you see something in a headline or something in the paper that suggests anything about this case, put it aside until next week when the trial is over, and then you can look at it and make whatever judgments about the newspaper's accuracy that you want. But don't consider it, don't look at it, and don't let it affect anything about your decision on this case. Can all of you agree with those rules?

THE JURORS: Yes.

THE COURT: Anybody think they can't? All right. Thank you, folks.

(Vol. II, Tr. 6-8.)

{¶ 30} We are to presume that the jury followed the trial court's instructions. *State v. DePew,* 38 Ohio St.3d 275, 284 (1988). Accordingly, even if we assume that the article contained information prejudicial to appellant's defense, the trial court instructed the jury to disregard such information and to decide the case strictly upon the evidence presented at trial. Appellant's trial counsel presented the trial court with no evidence upon which the trial court could conclude that a juror saw the article. Essentially, appellant's trial counsel asked the court to presume that the jurors ignored their prior instructions and

voir dire the jury to determine the extent of the prejudice. Given the information made available to the trial court, we find that the trial court acted reasonably when it refused the request. *See State v. Green*, 11th Dist No. 2003-A-0111, 2005-Ohio-6715, ¶ 48 (A trial court does not abuse its discretion by refusing to voir dire the jury about a single prejudicial article appearing in a local paper where the court is presented with no evidence that the jurors ignored the court's instructions to refrain from reading newspaper articles relating to the instant criminal proceedings).  Here, the record shows that the jurors answered in the affirmative when the trial court asked whether they would disregard any news media reports about the case.  Appellant's third assignment of error is overruled.

## C. Inadmissible Opinion Testimony

{¶ 31} In his final assignment of error, appellant argues that the trial court erred when it failed to sustain counsel's objection to certain testimony elicited by the State. During her direct examination, Nurse Duke testified as follows:

> Q. And was there anything about this case that you independently recall at the time you got the subpoena and saw the victim's name?
>
> A. Yeah, I kind of had some flashbacks.
>
> Q. Could you speak a little bit to that, what you mean by you had some flashes or flashbacks?
>
> A. There were certain aspects of this case that -- I don't want to sound silly, but affected me emotionally even, just from a secondary trauma.
>
> MS. KAZAR: Objection, Your Honor.
>
> THE COURT: Overruled. I think it's part of the explanation of the witness. Go ahead.
>
> A. I said I've done probably 150 to 200, and I can name about five of them that have given me nightmares, and this would have been one of them.

(Vol. II, Tr. 90-91.)

{¶ 32} The State contends that appellant's trial counsel failed to preserve a specific legal basis for the objection to the testimony and that we must review this assignment of error under the plain error standard. Evid.R. 103(A) states in relevant part:

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
>
> (1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context;
>
> * * *
>
> (D) Plain error. Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court.

{¶ 33} Appellant's trial counsel did not specify the grounds for objection nor did counsel move the court to strike Nurse Duke's testimony. Thus, appellant has waived all but plain error with regard to Nurse Duke's testimony. *State v. Lipsey,* 10th Dist. No. 08AP-822, 2009-Ohio-3956, citing *State v. Patterson,* 10th Dist. No. 97APA12-1682 (Sept. 22, 1998). Appellant argues, however, that Nurse Duke's testimony was not relevant and that the trial court erred to his substantial prejudice by failing to exclude it. Appellant further contends that Nurse Duke's comments unfairly bolstered Beight's credibility and unfairly prejudiced his defense. We disagree.

{¶ 34} Appellant does not argue that Nurse Duke's testimony constitutes a direct attestation as to Beight's veracity as would be proscribed by *State v. Boston,* 46 Ohio St.3d 108, 128 (1989) and its progeny. Rather, appellant argues that Nurse Duke's comment merely had the effect of bolstering Beight's credibility. As such, the testimony is not objectionable. *See State v. Cashin,* 10th Dist. No. 09AP-367, 2009-Ohio-6419, ¶ 20. Moreover, our review of the prosecutor's line of inquiry suggests that the prosecutor's intention was to reinforce Nurse Duke's claim that she remembered Beight's case even though she had interviewed more than 150 victims of sexual assault. Similarly, while Nurse Duke's opinion regarding the relative severity of the crimes had the potential of eliciting sympathy for Beight, her testimony does not necessarily implicate appellant.

{¶ 35} In short, as noted above, there was ample physical evidence to support Beight's account of the crimes.  Consequently, the admission of Nurse Duke's comment had no effect on the outcome of the case and any error with respect to the admission of such a comment was clearly harmless to the proceedings.

**D. Conclusion**

{¶ 36} Having overruled each of appellant's assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

SADLER, P.J,  and TYACK, J., concur.