[Cite as *State v. Shalash*, 2014-Ohio-5006.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-130748 |
| | | C-130749 |
| Plaintiff-Appellee, | : | TRIAL NOS. B-1207436B |
| | | B-1208349 |
| vs. | : | |
| | | *O P I N I O N.* |
| AHMAD SHALASH, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: November 12, 2014

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Blake P. Somers LLC, Blake P. Somers* and *Sarah Mosher*, for Defendant-Appellant.

Please note: this case has been removed from the accelerated calendar.

**FISCHER, Judge.**

{¶1} Defendant-appellant Ahmad Shalash was charged with four counts of robbery and two counts of aggravated robbery stemming from his involvement in four separate bank robberies. The aggravated-robbery counts included both one-year and three-year firearm specifications. A jury found Shalash guilty of all six counts and the accompanying specifications. The trial court sentenced Shalash to 44 years in prison.

{¶2} In this appeal, Shalash argues that (1) his convictions are not supported by the sufficiency and the weight of the evidence; (2) multiple instances of prosecutorial misconduct during closing arguments denied him a fair trial; and (3) the trial court erred in failing to specifically instruct the jury that the state had to prove the firearm specifications beyond a reasonable doubt. Finding none of Shalash's arguments meritorious, we affirm the trial court's judgment.

### The Charges against Shalash and the State's Evidence at Trial

{¶3} Shalash was charged in two separate indictments with robbery and aggravated robbery in connection with four bank robberies that had occurred over a six-week period from September 7, 2012, to October 22, 2012. In the case numbered B-1207436-B, the Hamilton County grand jury indicted Shalash on three counts of robbery and two counts of aggravated robbery. The robbery charge in count 1 concerned a theft at the Fifth Third Bank on Harrison Avenue. The aggravated-robbery charge in count 3 and the robbery charge in count 4 concerned a theft at the Cheviot Savings Bank. The aggravated-robbery and robbery charges in counts 5 and 6 concerned a theft at the First Financial Bank in Deer Park. The aggravated-robbery charges in counts 3 and 5 were accompanied by one-year and three-year firearm specifications. Shalash was also indicted in the case numbered B-1208349, for one

count of robbery in connection with a theft at the Emery Federal Credit Union. The following is a summary of the evidence presented at Shalash's trial with respect to each of the charges.

### Fifth Third Bank

{¶4} On September 7, 2012, around 5:00 p.m., Teresa Hellman, Valerie Turchinn, and Debbie Merkel were working at the Fifth Third Bank on Harrison Avenue in Cheviot when a man wearing a baseball hat, sunglasses, and gloves entered the bank. The man was carrying a long white bag and yelled, "Give me all your money. This isn't a joke. I've got a gun." The man used his hand to block his face. He then threw the bag at Hellman, who grabbed money from a cash drawer and put it in the bag. She also placed some $100 bills on top of the bag. The man snatched the bag and ran out of the bank. Hellman hit the alarm button and locked the doors. Some of the $100 bills fell on the bank floor. Hellman testified that $860 was missing from her cash drawer. The three women's descriptions of the robbery was consistent with video of the robbery taken from the bank's surveillance system that was played during the trial.

{¶5} Minutes after the robbery, Cheviot police officer James Dietrich arrived at the scene. He saw several $100 bills on the ground. He took written statements from the three bank employees and photographed the scene. Officer Jeff Patton arrived shortly thereafter with a K-9, Charlie. Charlie tracked the scent of the robber to the street. Officer Patton testified that the robber had likely entered a vehicle and fled from the scene.

### Emery Federal Credit Union

{¶6} On October 11, 2012, around 10:22 a.m., Sharon Haney, Ken Jones, and Stephanie Ash were working at the Emery Federal Credit Union when a man

3

entered the front door of the bank, yelling. The man was wearing a hoodie, a bandana over his nose, and gloves. He walked to Haney's window, told her he had a gun, and demanded that she give him the money in her cash drawer. The man told Ash and Jones to get down on the floor or he would shoot them.

{¶7} The man passed a bag to Haney and told her to give him all of the $100 and $50 bills. She opened her drawer, gave him the bills, and handed the bag back to him. The man then handed the bag back to Haney and demanded that she give him all the money in the drawer. Haney took the bag and gave him the remaining cash in the drawer. Haney gave the robber approximately $13,000. The man then fled from the bank. Haney testified that the man had placed a gloved hand over his mouth during the robbery.

{¶8} Ash testified that a day or two prior to the robbery a woman had entered the bank and had asked for information on opening an account. The day of the robbery, this same woman had entered the bank prior to the robbery and had spoken with another bank employee. Ash's, Jones's, and Haney's testimony was consistent with surveillance video of the robbery and surveillance video taken the day prior to the robbery.

{¶9} Officer Mark Peters testified that he had responded to a robbery at the Emery Federal Credit Union. When he arrived at the bank, uniformed officers were already there. He interviewed the bank employees and reviewed video from the bank's surveillance system. During his investigation, he had contacted the Green Township and Cheviot police. They had provided with him the names of two possible suspects, one of whom was Jennifer Neitz. When he returned to the Emery Federal Credit Union with a photograph of Neitz, the bank employees recognized her as having entered the bank both the day prior to and the day of the robbery. By working

with the two police agencies, Officer Peters testified he had developed a pattern for the bank robberies.

### Cheviot Savings Bank

{¶10} On October 19, 2012, around 4:30 p.m., Sheila Linemann and Maureen Monahan were working at the Cheviot Savings Bank when a man walked through the front door and yelled, "This is a robbery." The man was wearing blue jeans, a dark hooded sweatshirt, a "beanie-type" hat, a medical mask, sunglasses, and gloves. The man pointed a gun at Monahan, the bank's manager, who was in her office, and yelled, "Don't move." He then pointed the gun at the drive-through teller's head, and ordered her not to move. The man then ran up to Linemann's teller window, handed her a dingy pillowcase, and told her he wanted "large bills." Linemann gave the man $400 from her cash drawer.

{¶11} When Monahan moved, he pointed the gun at her again and said, "Don't move." Then he pointed the gun at the drive-through teller and Linemann and yelled, "More, I want more." When Linneman told the man that she didn't have any more money, he bolted through the door. Linemann activated the bank's alarm system. The police arrived five minutes later.

{¶12} Monahan testified that although the robbery lasted 45 seconds, it seemed like forever. She was very scared and thought that the robber "was going to blow her brains out." Monahan testified that the bank's surveillance system had captured a white van leaving the parking lot of the bank 20 seconds after the robbery had occurred. She further testified that prior to the robbery, a woman had come to the bank inquiring about opening a business checking account. The woman had come into her office, but she had appeared nervous and would not sit down. She spoke with the woman for a minute or two before she left the bank.

{¶13} Monahan identified a still photograph from the bank's surveillance system, which showed her speaking with the woman. Monahan's and Linemann's testimony was consistent with bank surveillance video of the robbery. The surveillance video depicted a white van in the back parking lot of the bank during the robbery.

{¶14} Nancy Wabnitz, a secretary at St. James Elementary School, and Constance Lanter, a nurse at the school, testified that around 1:15 p.m. on October 19, 2012, a suspicious man had entered the school and said he was looking for his brother. When the name the man gave Wabnitz and Lanter did not match the name of any current student at the school, Wabnitz asked him to leave the building. The man was captured on the school's surveillance video. He was wearing a gray hooded sweatshirt.

{¶15} Lanter testified that she followed the man outside the building and watched as he walked towards a credit union in front of the school. As the man approached the credit union, Lanter saw a woman walking back and forth behind the credit union. The man and woman both entered the front passenger side of a white van. Lanter testified that another man was sitting in the front seat of the van, and a young child was standing between the front seats of the van. The driver of the van, whom Lanter identified as Shalash, waved at her. Lanter waved back. The van then pulled out of the parking lot. The van had a Florida license plate. Lanter wrote down the van's license plate number and gave it to the police. She identified both the van and the woman at the credit union from still photographs taken from the surveillance video at the Cheviot Savings Bank.

*First Financial Bank*

{¶16} Andy Kunkel testified that on October 22, 2012, he was working as a teller at the First Financial Bank in Deer Park, Ohio. He heard a clanking noise on the glass of the bank's front door around 4:00 p.m., and saw a man enter the bank with a gun. The man pointed the gun at him and yelled, "Give me the money" before handing him a bag. Kunkel grabbed the money from his cash drawer and placed it on top of the bag. The man grabbed the cash and started towards the door. He then came back and grabbed the bag before fleeing from the bank. Kunkel testified that the robbery lasted roughly 15 seconds, and that video from the bank's surveillance system accurately depicted the robbery.

{¶17} Kunkel was shown a still photograph from the bank's surveillance system, which showed Kunkel speaking with a woman prior to the robbery, but Kunkel could not recall talking to her. Richard Ambrose, a loan originator at the bank, testified that he had walked to the front door of the bank after the robbery had occurred. As he looked out the door, he saw a white van on the left side of the street pulling out and driving away from the bank.

*Police Investigation Leads to Shalash, Neitz, and Pfalz*

{¶18} During their investigation of the First Financial Bank robbery, the police obtained surveillance video from a United Dairy Farmers ("UDF") and a Dairy Mart located near the First Financial Bank the day the robbery had occurred. Vijay Harsh, the owner of the Dairy Mart, testified that sometime around 3:00 p.m., two men had exited from a white van, entered the store, inquired about the price of a package of cigarettes and left. He identified Shalash from still photographs taken from the store's surveillance system as the man who had exited from the driver's side of the van and had entered the store. Alicia Banks, the store manager at the UDF,

testified that the store's surveillance video had captured a white van entering the UDF parking lot at 3:56 p.m.  A man in a white t-shirt got out of the van, entered the store, and purchased a package of cigarettes.

{¶19}  Detective Mike Lampe testified that he investigated the robbery at the Cheviot Savings Bank.  He responded to the bank the day of the robbery.  He was able to develop a lead in the investigation when surveillance video showed a white van leaving the scene of the robbery, and a patrol officer had recalled being dispatched to the St. James Elementary School earlier in the day for a report by a school nurse of a suspicious white van.  Detective Lampe testified that the patrol officer had obtained the van's license plate number from the school nurse.  The van was registered to Neitz. Detective Lampe testified that the van had discoloration and peeling paint that was visible in the surveillance video taken at the Dairy Mart the day of the First Financial Bank robbery, and in surveillance video taken from a Kroger store the day of the Cheviot Savings Bank robbery.

{¶20}  Detective Lampe testified that through his investigation of Neitz, he became familiar with Pflaz and Shalash.  Pfalz had remained in Ohio following the robberies.  He had been arrested and interviewed by police.  Pfalz gave a statement implicating himself, Neitz, and Shalash in the robberies.   Detective Lampe then traveled to North Carolina to interview Neitz and Shalash, both of whom had been arrested there on unrelated charges.  Shalash invoked his *Miranda* rights and chose not to speak with Detective Lampe.  Neitz, however, provided him with a detailed statement admitting her, Shalash's, and Pflaz's involvement in the four robberies.  Detective Lampe denied coercing Neitz, or threatening her in any manner to obtain her statement.   He testified that Neitz's statement was consistent with the surveillance video relating to each of the four robberies and with Pfalz's statement.

### Testimony of Shalash's Codefendants

{¶21} At trial, Neitz testified that she, Shalash, and Pfalz were addicted to heroin. One day as they were driving around in a white van with Pflaz's mother, Pfalz suggested that they rob a bank to obtain money to support their heroin habit. They traveled to the Fifth Third Bank on Harrison Avenue. Neitz walked inside the bank to report how many people were inside. When Neitz returned, Pfalz jumped out of the van, went inside the bank, and then returned to the van yelling, "Go, go, go." Once Shalash had driven the van from the area, Neitz became aware that Pfalz had robbed the bank. According to Neitz, Pfalz had divided the money among him, his mother, Shalash, and her. Neitz identified herself and Pfalz from still photographs taken from Fifth Third Bank's surveillance system just prior to and during the robbery.

{¶22} Neitz testified that on October 10, 2012, Pfalz had contacted Shalash and asked him to bring a gun with him so they could rob another bank. Neitz testified that she had previously purchased a gun. It was registered in her name, but the gun belonged to Shalash. Shalash, Neitz, and their four-year-old son, picked up Pfalz and his mother. As they drove around in the van, the four adults planned to rob the Emery Federal Credit Union. They agreed that Neitz would enter the credit union to ensure no customers were inside. While Neitz was inside the bank, Shalash drove the van around the bank's parking lot to see who was in the area. Just as Pfalz was about to enter the credit union, a man exited from his car and entered the credit union. When he did not come out of the credit union, the four decided to abandon their plan to rob the credit union. Neitz testified that still photographs from the surveillance system at the credit union showed her walking out

of the credit union on October 10, 2012, at 10:59 a.m. According to Neitz, the four adults agreed that they would return to the credit union the next day.

{¶23} The following day, Shalash drove back to the credit union. Neitz went inside the credit union again to "check things out." She identified herself from still photographs taken from surveillance video at the bank the day of the robbery. Neitz testified that Shalash had driven around the parking lot to see if a police car had left the area. As Pfalz robbed the credit union, Shalash circled the parking lot in the van. When Pfalz came out, he jumped in the van with the money. They drove to Pfalz's apartment, which was near the credit union, and divided the money from the robbery.

{¶24} Neitz testified that although the van was titled in her name, it belonged to Shalash. After each robbery, Shalash would drive Pfalz to a dumpster, so he could dispose of the clothing used in the robbery. The third robbery took place on October 19, 2012. That day, Neitz and Shalash picked up Pfalz and drove around in the van. Neitz testified that they had a gun with them, but it was not a real gun. Neitz was shown her prior statement to police in which she had said that they had a real gun with them, which was registered in her name, but that the gun really belonged to Shalash.

{¶25} They ended up at a credit union in front of St. James Elementary School. Neitz went into the credit union and Pfalz went into the school. When Pfalz came out of the school, she and Pfalz got into the van and left. They decided not to rob the credit union because Shalash was concerned that people inside the school could identify them. Neitz further testified that they were also concerned about the feasibility of robbing the credit union, because the door to the credit union was secured and had to be opened from the inside. So they drove around in the van for a

couple of hours, got high from heroin, and discussed robbing another bank. They ended up at the Cheviot Savings Bank. Neitz went inside the bank to check things out, Pfalz robbed the bank with the gun and a white bag from the van, and Shalash drove the van away from the bank. Pfalz came back with $400 that they used to buy "dope."

{¶26} On October 22, 2012, they robbed the First Financial Bank in Deer Park. Neitz testified that it was Shalash's idea to rob that particular bank, because he owned a building in the area and had been to the bank once before. They had picked up Pfalz, and were driving around in the van. Pfalz was nervous and wanted to get high before the robbery. They did not have any heroin, so Shalash told her to give Pfalz some of her pills. Neitz gave Pfalz the pills.

{¶27} Prior to robbing the bank, they stopped at two convenience stores to buy cigarettes. Neitz identified photographs of Shalash and Pfalz leaving the van, entering the convenience stores, and returning to the van. Following those stops, they traveled to the First Financial Bank. She entered the bank to see if there were any customers inside. Pfalz went into the bank with a gun and robbed it. Pfalz came out with money in his pockets, which they divided. They put Pfalz's clothing and gun in a Kroger bag and threw it in a dumpster in Kentucky.

{¶28} A few days later, Neitz and Shalash drove to North Carolina where they were arrested on unrelated charges. Neitz spoke with Detective Lampe while she was in custody in North Carolina. She gave him a statement implicating herself, Pfalz, and Shalash in the four robberies. She and Shalash were extradited to Ohio two months later. While in jail, she gave another statement to police. She also wrote Shalash letters trying to reassure him that she was going to help him. She was scared to tell him that she had spoken with police. Neitz admitted that she had testified

against Shalash to get a plea deal from the state, but she told the jury that she had not lied in order to receive better treatment.

{¶29} On cross-examination, Neitz testified that she had been under the influence of drugs when she had given her first statement, so her statement was inaccurate. Detective Lampe was insinuating that he could get her out of jail, if she would talk to him. Neitz was shown two letters that she had written to Shalash while in jail. Neitz admitted that in those two letters she had stated that Shalash had nothing to do with the robberies. On redirect examination, Neitz admitted that she had not been under the influence of drugs during either statement she had given police, she had not been coerced to give her statements, and she had lied in her letters when she had stated that Shalash had not been involved in the robberies.

{¶30} Pfalz testified that he was friends with Neitz and Shalash. During the course of their friendship, they had become addicted to pills and heroin. They started stealing things so they could continue to buy drugs. In September 2012, they were driving around high when they decided to rob a bank to feed their drug habit. They drove to a Fifth Third Bank. They decided that Neitz would go into the bank to check things out, Pfalz would rob the bank, and Shalash would drive the getaway van. Neitz went into the bank. When she came out, she told him that there were two people in the bank, it was closing time, and they were counting money. He went into the bank and robbed it. He did not have a gun. He ran to the van, and Shalash drove off. They split the approximately $900 he stole from the bank, using the money to buy heroin, gasoline, and cigarettes. He identified still photographs of himself and Neitz in the bank the day of the robbery.

{¶31} Pfalz testified that by October 10, 2012, they had run out of money and were driving around broke. They decided to rob the Emery Federal Credit Union

because it was close to Pfalz's grandma's house. They went to the credit union two or three times before they robbed it. They had planned to rob the credit union on October 10, but an older man had walked into the credit union and they had decided to abandon their plan. They returned the next day, October 11, 2012, and decided to proceed with the robbery. They agreed that Shalash would drive the van, Neitz would go in the bank and look around, and Pfalz would rob it. Pfalz identified himself and Neitz in still photographs taken from the bank's surveillance system before and during the robbery. He testified that he split the money from the robbery with Neitz and Shalash. Pfalz testified that he wore clothing that belonged to Shalash, and he used pillowcases and a bag from the van during the robberies. He further testified that he, Neitz, and Shalash wanted to get high before the robbery.

{¶32} Eight days later, on October 19, 2012, Neitz, Shalash, and Pfalz discussed robbing another bank. Pfalz testified that they drove to a credit union near a school. Pfalz went into the school, but he left when he was confronted by school employees. He got back in the van, and they drove to another bank, Cheviot Savings Bank. Pfalz testified that Neitz had entered the bank at 3:46 p.m. to "case it." He entered the bank shortly thereafter and robbed it. He admitted that he had pointed a gun and threatened to shoot the bank employees. He testified the gun was only a toy, but that he had acted like it was a real gun. He stole $500, and they split the money among them. Pfalz testified that Shalash drove the white van through a Kroger parking lot after the robbery.

{¶33} Three days later, Pfalz, Neitz, and Shalash robbed the First Financial Bank in Deer Park. Prior to the robbery, they had stopped at a couple of convenience stores. Pflaz identified himself and Shalash from still photographs taken from one of the store's surveillance videos. Pfalz testified that Neitz had

"checked out" the bank prior to the robbery, and that he had robbed the bank wearing clothing that Shalash kept in the van. Shalash had spray painted the toy gun he had brandished during the robbery. Pfalz admitted that during the robbery he had left the bag inside the bank and had to return to get it. Pfalz testified that he stole $1500, which he split with Shalash and Neitz.

{¶34} After the robbery, Pfalz threw the clothing and gun into a dumpster in Kentucky. He decided to stay in Ohio following the robberies so as to not draw suspicion to himself. Pfalz admitted that he had prior felony convictions for theft and that he had been promised leniency if he testified against Shalash.

### Jury Verdict and Shalash's Sentence

{¶35} The jury found Shalash guilty of all the aggravated-robbery and robbery charges, as well as the accompanying firearm specifications. The trial court merged the aggravated-robbery and robbery charges that related to the Cheviot Savings Bank and First Financial Bank. The court sentenced Shalash to eight years for each of the robbery charges and 11 years for each of the aggravated-robbery charges, and it ordered that the terms be served consecutively. The trial court also merged the one-year firearm specifications with the three-year firearm specifications for each of the aggravated robberies, and ordered that these terms be served consecutively to each other and to the prison terms for the aggravated-robbery and robbery offenses, for a total prison term of 44 years.

### Sufficiency and Weight of the Evidence

{¶36} In his first assignment of error, Shalash argues that his convictions for robbery, aggravated robbery, and the accompanying firearm specifications were supported by insufficient evidence and were contrary to the manifest weight of the evidence.

{¶37} To reverse a conviction for insufficient evidence, the reviewing court must be persuaded, after viewing the evidence in a light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). To reverse a conviction as against the manifest weight of the evidence, the reviewing court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and conclude that in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Id.* at 387.

{¶38} The state argued that Shalash was guilty as either a principal or as a complicitor to the four bank robberies. Complicity is defined as when a person "acting with the kind of culpability required for the commission of an offense * * * aid[s] or abets another in committing the offense." R.C. 2923.03(A)(2). To support a conviction for complicity by aiding and abetting, the state must show that the defendant assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime and that the defendant shared the criminal intent of the principal. *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 746 (2001), syllabus. Aiding and abetting can be inferred by presence, companionship, and conduct before and after the offense is committed. *Id.* at 243-245.

{¶39} Shalash was charged with robbery under R.C. 2911.02(A)(2). In order to prove the robbery counts, the state was required to prove that Shalash or his accomplice, in committing a theft offense, inflicted, attempted to inflict, or threatened to inflict physical harm on another. He was also charged with aggravated robbery under R.C. 2911.01(A)(1). To convict Shalash of the aggravated-robbery counts, the state was required to prove that Shalash or his accomplice, in committing

15

a theft offense, had a deadly weapon on or about his person or under his control and either displayed the weapon, brandished it, indicated that he possessed it, or used it. To establish the three-year firearm specification, the state was required to prove that Shalash or his accomplice had a firearm on or about his person or under his control while committing the offenses and displayed it, brandished it, indicated that he possessed it, or used it to facilitate the offenses. *See* R.C. 2941.145.

{¶40} Shalash primarily argues the state failed to prove his involvement in the offenses. He contends that Neitz's and Pfalz's credibility was undermined by the state's promises of leniency, and by conflicts in their testimony. He further argues that the state failed to present any physical evidence directly linking him to the offenses.

{¶41} But based upon our review of the evidence, we conclude the jury could have found that Shalash had participated in the robberies as either a principal or as an accomplice. Neitz and Pfalz testified that Shalash had conspired with them to rob the four banks to feed their heroin habits. Neitz's role was to "case" the banks, Pfalz's role was to rob the banks, and Shalash's role was to supply the disguises and the gun and to drive the getaway van. Neitz and Pfalz described the four bank robberies in detail. Pfalz testified that he had threatened to use a gun and that he had displayed a gun at the Cheviot Savings and First Financial Banks.

{¶42} Neitz's and Pfalz's testimony was supported by surveillance video from the four banks, surveillance video from St. James Elementary School near the Cheviot Savings Bank, and by surveillance video from a UDF and Dairy Mart near the First Financial Bank. Their testimony was also consistent with the testimony of the four banks' employees, and with Lanter's testimony that she had seen Pfalz, Neitz, and Shalash in a white van outside the St. James School, a couple of hours before the

Cheviot Savings Bank had been robbed. Neitz and Pfalz testified that the money from each robbery had been divided among Pfalz, Neitz, and Shalash. Thus, a rational jury could find that Shalash had actively participated in the offenses.

{¶43} Shalash also argues that the jury's verdict was against the manifest weight of the evidence. He argues that neither Neitz nor Pfalz were credible given that they had admitted to either being less than truthful on prior occasions or had demonstrated an inability to testify consistently under oath at trial, and they had agreed to testify against him for leniency in their own cases. But the jury was in the best position to evaluate their credibility and to determine the weight to be afforded their testimony. Given that the totality of the evidence established that Shalash had aided and abetted Neitz and Pfalz in the four offenses, and that Shalash has not demonstrated any basis for disturbing the jury's determination, we cannot conclude that Shalash's convictions were contrary to the manifest weight of the evidence. *See Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. We, therefore, overrule his first assignment of error.

### *Prosecutorial Misconduct*

{¶44} In his second assignment of error, Shalash argues that multiple instances of prosecutorial misconduct denied him a fair trial. Shalash argues the prosecuting attorney committed misconduct during closing argument when he presented extensive evidence of the robberies, focused on the scary nature of the crimes, argued that the crimes had been committed during a "heroin-induced frenzy," made inflammatory remarks about Shalash's religion, and improperly vouched for the credibility of a witness.

{¶45} A prosecuting attorney has wide latitude to summarize the evidence and zealously advocate the state's position during closing argument. *See*

*State v. Richey*, 64 Ohio St.3d 353, 362, 595 N.E.2d 915 (1992). The propriety of a specific remark by a prosecutor must not be judged in isolation, but in light of the tenor and context of the entire closing argument. *See State v. Slagle*, 65 Ohio St.3d 597, 607, 605 N.E.2d 916 (1992). Improper remarks during closing argument are grounds for reversal when the remarks serve to deny the defendant a fair trial. *See State v. Maurer*, 15 Ohio St.3d 239, 266, 473 N.E.2d 768 (1984).

{¶46} As Shalash admits, he did not object to any of the prosecutor's comments during closing argument. He, therefore, has waived all but plain error. *See State v. D'Ambrosio*, 73 Ohio St.3d 141, 143-44, 652 N.E.2d 710 (1995). Based upon our review of the record, we cannot conclude that the prosecutor's comments during closing argument rose to the level of plain error.

{¶47} The prosecutor's statements extensively summarizing the evidence against Shalash were not improper. The prosecutor's comments focusing on the "scary nature" of the robberies were based upon testimony from bank employees that they had been threatened with a gun, and their fear that Pfalz could have fatally shot them had he chosen to do so. Likewise, the prosecutor's statement that the robberies were the result of a "heroin-induced frenzy," was based upon testimony from Neitz and Pfalz that they had committed the robberies to feed their heroin habit, and that they had robbed the banks while "high" on heroin.

{¶48} Shalash next argues that the prosecutor committed misconduct when he repeatedly made inflammatory remarks about Shalash's religion. He points to three references to religion in the state's closing argument. The first reference occurred when the prosecuting attorney stated that Shalash and Neitz had been married at a mosque in Clifton. But nothing about this statement would serve to inflame the

jury's passions. The second reference occurred during the prosecutor's discussion of Neitz's and Pfalz's credibility, when he said,

> Is it common sense? Is it believable? Do you believe that a Muslim wife is going to somehow be driving around town with an outsider, Pfalz, a stranger to the family, robbing banks, and the husband has been with him just moments before and somehow he leaves the picture with the kids in the van?

The third reference occurred during the rebuttal portion of the state's closing argument when the prosecutor stated,

> Are you kidding me? Give me a break. And a Muslim wife on top of that. In that culture the women aren't even supposed to be out without a male relative and we got her robbing banks with a non-male relative with the kids in the truck. Give me a break. Give me a break.

{¶49} Although the comments were arguably inappropriate, they were not so inflammatory that we can conclude that Shalash's convictions resulted from passion and prejudice instead of the state's proof of his guilt. The state produced overwhelming evidence of Shalash's guilt, and none of the cited comments were so prejudicial or outcome determinative as to constitute plain error and to deny Shalash a fair trial.

{¶50} Finally, Shalash argues that the prosecuting attorney improperly vouched for the credibility of the school nurse when he said, "Obviously she's not going to lie to you." It is improper for an attorney to express a personal belief or opinion as to the credibility of a witness. *State v. Williams*, 79 Ohio St.3d 1, 12, 679 N.E.2d 646 (1997). Here, the prosecutor did not improperly vouch for the nurse's credibility as a witness. He merely argued that she was a reliable witness and that she lacked any motive to lie. Therefore, we overrule Shalash's second assignment of error.

19

### *Jury Instruction on the Firearm Specifications*

{¶51} In his third assignment of error, Shalash maintains the trial court erred by failing to separately instruct the jury that the state had to prove the firearm specifications beyond a reasonable doubt.

{¶52} Shalash did not object to any of the jury instructions at trial. He argues, nonetheless, that under the United States Supreme Court's decision in *Sullivan v. Louisiana*, 508 U.S. 275, 281, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), the trial court's failure to give this instruction is a "structural error" requiring automatic reversal. The state argues, on the other hand, that the trial court's failure to instruct the jury is a trial error amenable to a "plain error" analysis. *See State v. Blankenship*, 102 Ohio App.3d 534, 546, 657 N.E.2d 559 (12th Dist.1995); *State v. Norman*, 1st Dist. Hamilton No. C-920202, 1993 Ohio App. LEXIS 133, *8-9 (Jan. 20, 1993).

{¶53} After reviewing the case law and the record, we agree with the state that a plain-error analysis applies. The structural error at issue in *Sullivan* was the denial of the right to trial by jury by giving a defective reasonable doubt instruction. *Sullivan* at 279. The instruction the trial court gave to the jury suggested that the jury had to have a higher degree of doubt than is required for acquittal under the reasonable-doubt standard. *Id.* at 276-277. The *Sullivan* court held that a "beyond-a-reasonable-doubt instruction" that misdescribes the burden of proof requires per se reversal. *Id.* at 281.

{¶54} Here, however, the trial court properly instructed the jury on the reasonable-doubt standard at multiple times during the jury charge. At the beginning of the jury charge, the trial court stated:

20

[t]here is no requirement that the defendant present any evidence. The duty of proof rests entirely with the state of Ohio. The defendant must be acquitted unless the state produces evidence which convinces you beyond a reasonable doubt of every essential element of the crime charged in the indictment.

Reasonable doubt. Reasonable doubt is present when the jurors after they have carefully considered and compared all the evidence cannot say they are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense. Reasonable doubt is not mere possible human doubt because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs.

At the end of each count of the indictment, the trial court instructed the jury that the state was required to prove the elements of the offense listed in that count of the indictment beyond a reasonable doubt.

{¶55} The trial court specifically instructed the jury that the aggravated-robbery charges in counts 3 and 5 of the indictment included the necessity of finding that Shalash, while committing the robbery, or immediately fleeing thereafter, "had a deadly weapon on or about his person, or under his control, and displayed, brandished, indicated possession or used the deadly weapon, to wit: a firearm." The court also instructed the jury that it specify on counts 3 and 5 whether it found that Shalash "did have on or about his person, or under his control, a firearm, while committing the offense of aggravated robbery."

21

{¶56} When taken together, these jury instructions satisfied the requirement of instructing the jury that the firearm specifications had to be proven beyond a reasonable doubt.   Therefore, the trial court did not commit plain error by failing to separately instruct the jury that the state had to prove the firearm specifications beyond a reasonable doubt. *See Blankenship*, 102 Ohio App.3d at 546, 657 N.E.2d 559; *State v. Norman*, 1st Dist. Hamilton No. C-920202, 1993 Ohio App. LEXIS 133, at *8-9; *State v. Dubose*, 7th Dist. Mahoning No. 00-CA-60, 2002-Ohio-3020, ¶ 20-35; *State v. Penson*, 2d Dist. Montgomery No. 9193, 1990 Ohio App. LEXIS 732, *32 (Feb. 26, 1990); *State v. Small*, 8th Dist. Cuyahoga No. 68167, 1995 Ohio App. LEXIS 4844, *19-20 (Nov. 2, 1995).   We, therefore, overrule Shalash's third assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

**CUNNINGHAM, P.J,** and **DEWINE, J.,** concur.

Please note:
 The court has recorded its own entry this date.