[Cite as *State v. Hsu*, 2016-Ohio-4549.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-150635 |
| | | TRIAL NO. 15CRB-12892 |
| Plaintiff-Appellee, | : | |
| | | |
| vs. | : | *O P I N I O N.* |
| | | |
| GERRY VICTOR HSU, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Municipal Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  June 24, 2016

*Natalia Harris*, City Prosecutor, and *Heidi Rosales*, Assistant City Prosecutor, for Plaintiff-Appellee,

*Dennis C. Belli,* for Defendant-Appellant.

**FISCHER, Presiding Judge.**

{¶1} Defendant-appellant Gerry Victor Hsu appeals his conviction, following a bench trial, for public indecency, a fourth-degree misdemeanor, under R.C. 2907.09(A)(1). He argues that (1) his conviction is not supported by the sufficiency and the weight of the evidence, (2) the trial court's failure to inform him of his right to a jury trial requires reversal of his conviction, and (3) prosecutorial misconduct during his cross-examination and closing argument denied him a fair trial. Finding none of his assignments of error meritorious, we affirm the trial court's judgment.

### Evidence Adduced at the Bench Trial

{¶2} At trial, the state presented testimony from Natalie Holthaus, a Cincinnati Zoo employee. Holthaus testified that she was leaving work and walking to her car in the employee parking lot, on April 10, 2015, when she heard footsteps and keys jingling behind her. A man she later learned was Hsu said, "Excuse me, ma'am." Holthaus turned around to look at him. Hsu was wearing a white t-shirt and sweatpants made of a "swishy" material. He was carrying a black messenger bag across his body that was pulled level with the waistband of his pants. Hsu, who had walked around toward the front of Holthaus, asked her if she worked at the zoo. She replied, "Yes." Hsu then asked, "What's your job at the zoo?"

{¶3} At that time Holthaus noticed that Hsu started to look side to side and his hand moved towards his bag. Holthaus testified that she became a little nervous, wondering if Hsu was going to rob her. Holthaus started to explain that she worked in the wildlife encounters. She was looking around to see if a security guard was nearby. When she looked back at Hsu, he had his penis sticking out of the top of his waistband, and was holding it and moving his hand. Holthaus demonstrated what she had seen to

the trial court, explaining that Hsu's hand was behind the bag, pushing the bag out from his body. She testified that Hsu had pulled his penis up over the top of the bag, and she saw maybe one-third of his penis, because part of it was under his waistband and his hand was on the other part. Holthaus testified that when she saw this, she looked away and said, "What are you doing?" She felt disgusted and wanted to get Hsu to leave, so she started looking around and yelling for security. As she yelled for security, Hsu turned his back towards her and began quickly walking away. The security guard, who had been patrolling the parking lot in the area between Hsu and his parked car, came towards them. She stopped Hsu and talked to him. When the security guard asked Holthaus what had happened, she said Hsu had flashed himself to her. Holthaus gave the security guard her name. At that point, another woman came up to her and asked her what had happened. After briefly telling the woman, Holthaus left the parking lot. The following day, Holthaus gave a statement to the zoo security, detailing the incident with Hsu.

{¶4}    The state then presented testimony from Katherine Butler, a postdoctoral psychology fellow at the Cincinnati Veterans Affairs ("VA"), who stated that the same day Holthaus had encountered Hsu, she had been walking with a group of VA employees from the VA toward her car, which was parked in the Cincinnati Zoo employee lot, when she was approached by a man she later learned was Hsu. Hsu was wearing blue workout pants and white gym shoes, and he was carrying two bags. Hsu had a blue nylon bag in his left hand over his shoulder and a black messenger bag over the front of his body, hanging over to his left side. Hsu had initially been walking along the same path in front of Butler, but he had left the path for a little bit. Butler testified that he had then come back to the same path and slowed his pace to walk next to her. Butler testified that Hsu was walking really close to her right side. His right elbow was

crooked and it looked as if his right hand was in his pocket. Hsu kept on turning his body toward her. Hsu asked her how she was doing, and Butler replied in a curt voice, "Fine." Butler testified that she felt very uncomfortable because Hsu was standing so close to her. She kept walking. Butler testified that eventually Hsu walked more quickly ahead of her and she felt relieved. But Hsu then slowed again and was walking with her through the majority of the zoo parking lot. Hsu picked up his pace, and stopped to talk to a woman, she later learned was Holthaus. Butler testified that she felt relieved again when Hsu walked up to Holthaus. She saw Hsu, whose back was towards her, and Holthaus talking for a bit, and then Holthaus called for security. At that point, Hsu proceeded on his path. After she heard Holthaus yell for security, Butler testified that she was very upset because Hsu had followed her from the VA. Butler could not recall if she had stopped to talk Holthaus before continuing to her car. She had been very upset and she had left the parking lot.

{¶5} On cross-examination, Butler testified that she had seen Holthaus call for security and tell the security guard that Hsu had "pulled his dick out." Her car had been parked right behind where they had been standing. The security guard had then turned and walked toward Hsu, who had starting walking to his car, which was parked along the edge of the lot. Butler had no memory of the security guard speaking with Hsu before speaking with Holthaus.

{¶6} Samantha Beltran, a security guard for the Cincinnati Zoo, had been assigned to the employee parking lot. As she was walking through the parking lot, she heard a female voice yell, "Security." She turned around and saw Holthaus. Hsu was walking quickly away from her and towards Beltran. As Beltran started walking towards them, she put her hand up to stop Hsu from walking past her and she asked him what was going on. Hsu told Beltran that he was just being friendly. When she

4

asked Hsu what he was doing in the parking lot, Hsu said that he had parked there. Beltran then asked Hsu if he was a VA employee. He responded affirmatively and walked past Beltran. Beltran then walked up to Holthaus and asked her what had happened. Holthaus replied, "He just pulled his dick out in front of me." Beltran testified that she was taken back for a moment by Holthaus's statment. Beltran told Holthaus that she was going to stop Hsu and talk to him to see what had happened. As Beltran was walking toward Hsu's car, she contacted her supervisor and told him what had happened. She then walked up to Hsu, who was in his car, and asked him to wait for her supervisor to arrive. Hsu stopped the car and turned off the engine. He rolled down his window. She asked Hsu where he worked in the VA, and he replied, "Why should I tell you." Beltran then asked him for identification, but Hsu refused to provide it. Beltran waited with Hsu until her supervisor, Joe Desjardins arrived. Beltran testified that Hsu kept asking her if he could leave.

{¶7} At one point, Hsu asked her what was going on and she told him there was a claim by a zoo employee and she was just trying to figure out what had happened. She thought she had told Hsu the specific allegation, but she couldn't recall. She testified that Hsu denied anything had happened. He said several times that he was just being friendly. He told Beltran he was just trying to talk to Holthaus and learn where she worked and that kind of information. When Desjardins arrived, he asked Hsu for his identification, which Hsu gave him. On cross-examination, Beltran admitted that in her written statement about the incident, she had referred to Holthaus by the wrong first name.

{¶8} Joe Desjardins, a security operations supervisor at the Cincinnati Zoo, testified that he came into contact with Hsu on April 10, 2015, following a radio call from Beltran about an incident in the zoo's employee parking lot. When he arrived, he asked

Hsu what had happened. Hsu said he was just being friendly with a zoo employee by asking her where she worked. When he asked Hsu why the employee had called for security, Hsu did not reply.

{¶9} Desjardins recalled that at some point during his questioning of Hsu, Hsu had stated, "There was no funny business." Desjardins asked Hsu for his identification, and Hsu gave it to him. Desjardins then called his supervisor, who contacted the VA police. Hsu seemed agitated. He wanted to go home, and asked a couple times if he could leave, but Desjardins told him he needed to wait because a police officer from the VA needed to speak with him.

{¶10} Desjardins testified that the incident with Holthaus had taken place on a Friday. He then saw Hsu at the zoo the following Sunday. Desjardins told Hsu to leave the zoo's premises. Hsu said he would not leave without a refund. Desjardins waited with Hsu for 25 minutes for the Cincinnati police to arrive. The Cincinnati police then escorted Hsu from the zoo's premises.

{¶11} Wayne Lohmoeller, a security manager at the Cincinnati Zoo, testified that he monitors the security cameras at the Cincinnati Zoo. When he heard Beltran's radio call, he turned the security camera positioned near the employee parking lot to follow Beltran as she walked to where Hsu had parked his car. He then positioned the security camera to monitor that area. He identified a video of Beltran and other zoo security personnel with Hsu on the day of the incident. On cross-examination, Lohmoeller testified that the actual incident between Holthaus and Hsu had not been captured on the security camera. He authenticated a series of photographs that had been taken from the security camera.

{¶12} Officer Ken Wells testified that he is employed by the VA police department. Prior to serving in that capacity, Wells had served as a Cincinnati police

officer for 32 years, assigned to patrol and investigations and the personal-crimes unit. Wells responded to the Cincinnati Zoo employee parking lot on April 10, 2015. When he arrived, Hsu was standing outside his car with several zoo security officers. After Wells spoke with the security officers and Hsu, Hsu agreed to accompany Wells to the VA's security office and make a statement about what had occurred.

{¶13} Officer Wells advised Hsu of his *Miranda* rights, and Hsu signed a form indicating that his *Miranda* rights had been provided. Hsu then made a written statement. Officer Wells testified that the part of Hsu's statement that stood out to him was when he wrote, "I asked her when a good day to go to the zoo was. She looked at me and said, 'What are you doing?' " Officer Wells testified that he thought that it was odd that Hsu would put that sentence in his statement describing an incident where he had just stated that nothing had been going on. So he asked Hsu to clarify why Holthaus had randomly stated, "What are you doing?" Hsu, however, would not answer his question. Officer Wells then asked Hsu why he thought Holthaus had called security, but Hsu did not reply. Officer Wells asked Hsu a couple more questions directly related to what had happened, but Hsu would not respond. Hsu signed the statement as written. Wells told Hsu he could no longer park in the zoo employee parking lot. He then released Hsu and told him that the investigation was ongoing. Hsu subsequently contacted Officer Wells to let him know he had retained counsel and would not be speaking to him anymore. Officer Wells testified that, a month before trial, an anxious Hsu had approached him as he was leaving the VA and told him that he was going to be subpoenaed for trial.

{¶14} On cross-examination, Officer Wells testified that Hsu had admitted to walking and talking with Holthaus. Hsu told Wells he was trying to be friendly and engage the victim in general conversation. Hsu admitted to asking her where she

7

worked and what the best day to go to the zoo was, but he had stated several times during the interview that he had not exposed his private parts to her.

{¶15}   Hsu testified in his own defense.   Hsu testified that he had graduated from Princeton High School and had received a medical engineering degree from Johns Hopkins University.  He had been practicing for three years as a physician's assistant at the VA and had worked in the medical field for 12 years.  On April 10, 2015, he had planned to go running after work, so he changed into a t-shirt and running shorts.  He put on a jacket and running pants over them.

{¶16}   Hsu identified himself in a series of photographs that had been taken after the incident. The photographs showed Hsu in this clothing with two bags positioned on his left shoulder.  Hsu testified that the photos showed exactly how he had been dressed on the date of the incident with Holthaus.   Hsu testified that he had been wearing briefs, running shorts, and running pants, and that his running shorts had been tied.

{¶17}   Hsu testified that it was a nice, beautiful day in April, and he wanted to talk to people.  So when he saw Holthaus walking through the parking lot, he decided to strike up a conversation with her.   He said, "Excuse me.  Hello.  Do you work at the zoo?" Holthaus had replied, "Yes."  And then Hsu said, "Where do you work?"  Holthaus then replied, "Wildlife Encounters."   Hsu then asked her when would be a good time to visit the zoo.  Holthaus paused for a few seconds and then said, "What are you doing? Security.  Security."

{¶18}   Hsu testified that he had already purchased tickets to the zoo when he had talked to Holthaus.   He denied exposing himself to Holthaus.  He testified that his left hand had been encumbered by his bags, leaving only his right hand free so that he could get his keys out of his pants.  Hsu testified that his running shorts had ties, and

that singlehandedly he would have been unable to untie or retie his shorts quickly. Otherwise, the ties on his shorts would have been messy and they were not. Hsu testified that when Holthaus had said, "What are you doing?" she had emphasized "what," like he did not know what she was talking about. She had sounded annoyed. And then she had started to sound angry. At that point, he just froze. He did not know what to think. He was shocked and sad, too, because he had just meant to have a friendly conversation.

{¶19} Hsu testified that he did not say another word to Holthaus. As he walked to his car, he saw a security guard walking toward him from the middle of the parking lot. She intercepted him and asked what had happened. He told her that he was just trying to be friendly. He then walked back to his car. He was sitting in his car when the security guard snuck up on him, knocked on his window, and detained him.

{¶20} Hsu pointed out that in the photos taken by the zoo security camera, he was wearing long blue pants and a jacket. He testified that his pants were tied and he did not look disheveled. He testified that he was "clueless" as to what the allegations against him were until he spoke with Officer Wells. He had made a written statement and then had gone home. Hsu testified that before the criminal charges were filed against him, he was served with a temporary restraining order. He retained counsel, and it had been another month or two before he and counsel even knew that charges were going to be pressed. Up to that point, he had been preparing to deal with a protection order. He denied that he did anything inappropriate.

{¶21} On cross-examination, Hsu admitted that the photos that he testified had depicted his clothing the day of the incident had not been taken that day, but had been taken at a later date. He further agreed that the photos were merely demonstrative of what he had said he had been wearing that day. He further admitted that no one had

testified to him wearing all these layers of clothing, and that it was really just his word as to how the drawstrings on his pants had been tied that day.

{¶22} Hsu maintained that Holthaus had been mistaken when she had testified that he had carried the bag across the front of his body. He agreed that the strap of the black bag was long enough to carry across his body, but he testified that he never carried his bag this way. When the assistant prosecuting attorney pointed out that the security video was too far away to discern how Hsu's shorts and pants were tied or how Hsu had been carrying his bags that day, Hsu disagreed, maintaining that one of the still photos from the video showed he had been carrying both bags on his left side.

{¶23} Hsu denied that he had done anything inappropriate, and stated there was nothing wrong with "flagging someone down" to make small talk. He denied hearing Holthaus's statements to Beltran and Butler that he had exposed himself. He denied that Beltran had asked him for his identification or that she had informed him of Holthaus's allegations.

{¶24} Hsu further testified that he had not recalled Officer Wells asking him to clarify his written statement. When asked if there was any disjuncture in his statement to Officer Wells where he had written that Holthaus had said, "What are you doing?" Hsu responded, "Yes, that statement can be interpreted two ways. The first, as I explained is what are you doing, which means what are you doing physically. That's not what she said. She said, what are you doing in an annoying type of expression – becoming angry as the conversation went on." When asked in a series of differently phrased questions if this disjucture in his statement could be interpreted to support Holthaus's version of the events, Hsu provided vague responses that never really answered the questions, prompting the prosecuting attorney to keep asking Hsu different questions in an effort to solicit a direct answer from him.

{¶25} On redirect, Hsu testified that he didn't understand the assistant prosecuting attorney's questions. He testified that he felt it was important for him to write down exactly what Holthaus had said that day. He testified that Holthaus's statement, "What are you doing?" meant that she didn't want to have a conversation with him.

{¶26} Hsu also presented testimony from Dr. Houston L. Lumpkin, III, M.D., his clinical supervisor at the VA, and Quoc Tra, a friend. Dr. Lumpkin testified that he had supervised Hsu for two to three years. Hsu was a hard worker, who was very honest and likeable and got along well with others. He further testified that Hsu was law abiding, and the indecent-exposure allegation did not seem to fit with Hsu's character. On cross-examination, Dr. Lumpkin admitted that his interaction with Hsu at the VA was limited to five minutes to one-half hour each day, and that he had never socialized with Hsu outside work. When asked what type of characteristics he would expect a person committing the crime of public indecency to exhibit, Dr. Lumpkin testified that he had "no idea." He admitted that there was no set profile or characteristics that one would look for, and that typically one is surprised to hear of such allegations unless the person has a prior history of such behavior.

{¶27} Quoc Tra testified that he had known Hsu for a year. They had met through a networking group, and he often socialized with Hsu. He testified that Hsu was a very outgoing person, who often approached strangers to make small talk and to ask them their names and phone numbers. He further testified that Hsu was law abiding and that the allegations were not consistent with Hsu's character. He additionally testified that he had never known Hsu to be an antisocial person, and exposing himself would be an antisocial act. On cross-examination, Tra admitted that he had had extensive discussions with Hsu about the allegations against him. Tra further admitted

that he did not know why people exposed themselves or what characteristics one would look for to discern if someone was engaging in that behavior.

{¶28} At the conclusion of the testimony, the trial court heard closing argument and took the matter under advisement. After reviewing the video from the zoo's security camera, the trial court stated that its decision came down to the credibility of the witnesses, and the court found the state's witnesses to be more credible. Thus, the trial court found Hsu guilty of public indecency.

### *Weight and Sufficiency of the Evidence*

{¶29} In his first assignment of error, Hsu argues his conviction was based on insufficient evidence and against the manifest weight of the evidence.

{¶30} In reviewing a challenge to the sufficiency of the evidence this court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶31} When addressing a manifest-weight-of-the-evidence challenge, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* at 387.

{¶32} R.C. 2907.09(A) provides that "No person shall recklessly do any of the following under circumstances in which the person's conduct is likely to be viewed by and affront others who are in the person's physical proximity and who are not members of the person's household: (1) expose the person's private parts."

{¶33} At trial, Holthaus testified that she had been leaving work at the Cincinnati Zoo when Hsu had walked up to her in the employee parking lot and had engaged her in conversation. He then had moved aside his bags, which he was holding in front of his middle, to expose his erect penis to her and masturbate. Holthaus turned and yelled for security. Holthaus testified that she had never seen or met Hsu prior to their encounter, and that she had been "grossed out" by his behavior. Holthaus immediately had called for security, and had stated that Hsu had "flashed his dick" at her. Holthaus's testimony, if believed, was sufficient for the trial court to find that Hsu had committed public indecency. *See, e.g, State v. Johnson,* 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 53; *State v. Curry*, 3d Dist. Allen No. 1-15-05, 2016-Ohio-861, ¶ 61.

{¶34} Hsu argues, nonetheless, that Holthaus's testimony was insufficient to support his conviction. He argues that he presented physical evidence to render Holthaus's testimony so inherently incredible that a reasonable trier of fact could not have given it any probative value. He cites this court to civil case law concerning the "physical facts" rule, which provides that "if one party presents enough physical evidence to support his version of a controverted issue, then the other party's testimony regarding the issue might be rendered so inherently incredible that a court should not give it any probative value." *See Maret v. CSX Transp., Inc.*, 130 Ohio App.3d 816, 823, 721 N.E.2d 452 (1st Dist.1998), citing *McDonald v. Ford Motor Co.*, 42 Ohio St.2d 8, 12, 326 N.E.2d 252 (1975).

{¶35} While this court has never addressed a "physical facts" argument in a criminal case, the Tenth and Twelfth Appellate Districts have considered and rejected "physical facts" arguments similar to the ones that Hsu makes in this case. In *State v. Dye*, 10th Dist. Franklin No. 13AP-420, 2014-Ohio-1067, ¶ 18-24, for example, the

Tenth Appellate District rejected a "physical facts" argument by the defendant, who had been convicted of rape. The defendant had argued that the victim's testimony was so unworthy of belief that it was legally insufficient to convince a rational trier of fact that he had perpetrated the crimes against her. He maintained that the lack of male DNA at the scene, including the lack of seminal fluid, contradicted the victim's testimony that the defendant had ejaculated during the commission of the rape. Thus, he asserted the lack of DNA evidence proved that the victim had lied about the rape. *Id.* at ¶ 21. The Tenth District disagreed, noting that DNA matching the defendant's profile had been recovered on a scarf that had been used to choke the victim, and while DNA testing of a vaginal swab failed to implicate the defendant in the crime, it did not rule out the presence of male DNA in fluid from the victim's cervix. *Id.* at ¶ 22-24. Consequently, the Tenth District concluded that the physical facts in Dye's case did not render the victim's testimony insufficient to support his conviction. *Id.* at ¶ 24. *See State v. Nick*, 10th Dist. Franklin No. 12AP-845, 2013-Ohio-3453, ¶ 13-14 (also rejecting a physical facts argument).

{¶36} Similarly, in *State v. Coleman*, 12th Dist. Fayette No. CA2011-09-020, 2012-Ohio-3630, ¶ 14, the Twelfth Appellate District rejected the defendant's argument that the police officer lacked probable cause to stop him for driving with an obstructed license plate based on the "physical facts" rule. The defendant had argued that photographs, which had been admitted at the suppression hearing, contradicted the police officer's testimony that the clear plastic cover on the license plate obstructed his view of the defendant's license plate. *Id.* The Twelfth District acknowledged that the photographs "show[ed] the license plate was legible and that the plastic covering on it could not be seen in the photographs," but it nonetheless concluded that the "physical facts rule" did not apply because the photographs, which had been taken under

14

markedly different circumstances than those that existed on the night in question, were not so conclusive as to rebut the officer's testimony. *Id.* at ¶ 15.

{¶37} Likewise, in this case, we find Hsu's "physical facts" argument to be belied by the record. The security video from the zoo did not capture the encounter between Hsu and Holthaus. The photographs Hsu claims depicted how his shorts had been tied tight, making it physically impossible for him to have pulled out his penis without making his clothing look messy, were taken on a different day, and Hsu admitted they were merely illustrative of the clothing he had been wearing the day of the incident. Moreover, our review of the security-camera photos shows that, following his confrontation with Holthaus, Hsu was wearing a jacket that was zipped up and that covered the waistband of his pants. No other witness besides Hsu testified that he had been wearing running shorts underneath his pants on the day of the incident. As a result, we reject Hsu's argument that the physical facts in this case so contradicted Holthaus's testimony as to make it inherently incredible.

{¶38} Hsu next argues the trial court lost its way by giving more credibility to the state's witnesses than his own. Hsu admittedly presented a different version of events at trial. According to Hsu, he was merely trying to engage Holthaus in conversation when she became annoyed with him and called for security. Hsu denied exposing himself to Holthaus, and asserted that it was physically impossible for him to have done so, given all the clothing he had been wearing, without anyone noticing anything unusual about his clothing. He presented several photos of himself in the three layers of clothing he claimed he had been wearing on the day of his encounter with Holthaus at the zoo and he asserted that nothing in the security video showed his clothing was out of place.

{¶39}   While Holthaus was admittedly the only witness to testify that she had seen Hsu expose his penis, testimony from the state's other witnesses corroborated other portions of Holthaus's testimony while conflicting with portions of Hsu's testimony.  For example, Butler testified that just prior to the incident with Holthaus, Hsu had been following her very closely to the parking lot and engaging in conduct that had made her feel very uncomfortable.  Butler, likewise, testified that Hsu had been carrying his black messenger bag across his body, and that he had been turning his body toward her as walked closely beside her to the parking lot. Holthaus's actions immediately following the incident, moreover, were consistent with someone who had just experienced being "flashed."  She immediately called for security. Both Beltran and Butler testified that Holthaus made the same statement to them regarding the manner in which Hsu had exposed himself to her.

{¶40}   Moreover, Desjardins testified that when Hsu spoke of his exchange with Holthaus he had unexpectedly said he had not engaged in any "funny business." Officer Wells, likewise, stated that he found Hsu's statement that Holthaus had asked him what he had been doing to be curious given that Hsu had denied any wrongdoing, and that when he had asked Hsu to explain the disjuncture between his question to Holthaus and Holthaus's response to him, Hsu had refused to answer him.  While Hsu readily offered an explanation during his testimony at trial that could have accounted for the disjuncture in his statement to Officer Wells, the trial court could have concluded that Hsu's explanation was self-serving and not a truthful depiction of the events that had occurred with Holthaus given his vague answers on cross-examination and his failure to provide this explanation immediately after the incident.

**{¶41}** The trial judge was in the best position to observe the demeanor, gestures, voice inflection, and body language of the witnesses, and to perceive the interplay between the witnesses and the examiner. *See State v. Lesure*, 6th Dist. Lucas No. L-02-1157, 2004-Ohio-3454, ¶ 20. Based upon our review of the record, we cannot conclude that Holthaus's testimony was so unreliable or unworthy of belief that the trier of fact lost its way and created a manifest miscarriage of justice in convicting Hsu of public indecency. *See Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541; *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). We, therefore, overrule his first assignment of error.

### *Failure to Inform of Jury Trial Right at the Initial Appearance*

**{¶42}** In his second assignment of error, Hsu argues that the trial court erred by failing to inform him at his initial appearance of his right to a trial by jury and the need to file a written demand in order to exercise that right as set forth in Crim.R. 5(A)(5).

**{¶43}** Crim.R. 5(A)(5) requires the trial court to inform a defendant at the first appearance before a judge or magistrate "[o]f the right, where appropriate, to jury trial and the necessity to make a demand therefor in petty offense cases."

**{¶44}** The record reflects that when Hsu was arraigned on May 27, 2015, he was represented by counsel. At the arraignment, counsel entered a plea of not guilty on Hsu's behalf, and the matter was referred for a pretrial. The record admittedly contains no recitation of Hsu's right to a jury trial. Hsu argues that the trial court's failure to advise him of his constitutional right to a jury trial is per se prejudicial error that requires this court to reverse his conviction and remand his case for a jury trial.

**{¶45}** The case law Hsu relies upon to support his position, however, is factually distinguishable. *See, e.g., City of Middletown v. McIntosh*, 12th Dist. Butler

17

No. CA2006-07-174, 2007-Ohio-3348, ¶ 6-14, following *State v. Boerst*, 45 Ohio App.2d 240, 241, 343 N.E.2d 141 (9th Dist.1973) (where the court held the failure to inform an *unrepresented* defendant of his Crim.R. 5 rights at his initial appearance results in reversible error); *State v. Hutson*, 2d Dist. Montgomery No. 18603, 2001 Ohio App. LEXIS 5457 (Dec. 7, 2001) (holding the trial court's failure to advise the defendant of the need to demand a jury at his initial appearance, as required by Crim.R. 5, prejudiced the defendant where he had twice demanded a jury trial, but the trial court had denied the request as untimely).

{¶46} Here, as the state points out, Hsu was charged with public indecency, a fourth-degree misdemeanor, which is a petty offense for which there is no automatic right to a jury trial. Thus, Hsu would have had to file a written request. *See* Crim.R. 23. Hsu was represented by counsel at the time he made his initial appearance and entered his not-guilty plea. He continued to be represented by counsel during the remainder of the trial court proceedings. Hsu's counsel did not elect to file a written request for a jury trial. Hsu has not challenged on appeal the effectiveness of his counsel for failing to file such a request. Moreover, nothing in the record shows Hsu's desire to be tried by a jury.

{¶47} Furthermore, in *Hamilton v. Brown*, 1 Ohio App.3d 165, 167, 440 N.E.2d 554 (12th Dist.1981), the Twelfth Appellate District rejected a similar argument to the one that Hsu makes in this case. The *Hamilton* court held that "the procedure for arraignment set forth in Crim.R. 5(A) and 10(A) is for one purpose: to advise the accused of his constitutional rights and to inform him of the nature of the charge against him. However, when the accused is represented by counsel, pleads not guilty, and proceeds to trial without objection, there is a waiver of the requirements of those rules." Other Ohio appellate courts have reached the same conclusion. *See State v.*

*Eschrich*, 6th Dist. Ottawa No. OT-06-045, 2008-Ohio-2984, ¶ 21; *State v. Nickerson*, 8th Dist. Cuyahoga No. 70910, 1997 Ohio App. LEXIS 2554 (June 12, 1997); *City of Portsmouth v. Ritch*, 4th Dist. Scioto No. 97CA2491, 1998 Ohio App. LEXIS 2193 (May 11, 1998); *State v. Smith*, 9th Dist. Lorain No. 95CA006325, 1996 Ohio App. LEXIS 2652 (June 26, 1996). Hsu's election to plead not guilty and to proceed to a trial, while being represented by counsel, waived any potential constitutional violations related to his arraignment. As a result, we overrule his second assignment of error.

### Prosecutorial Misconduct

{¶48} In his third assignment of error, Hsu argues that the assistant prosecuting attorney committed misconduct, which denied him due process and a fair trial, by repeatedly questioning him during cross-examination about his statement to Officer Wells and by stating during closing argument his personal belief that Holthaus was a credible witness.

{¶49} When reviewing a claim of prosecutorial misconduct, we must first determine whether the prosecutor's conduct was improper, and if so, whether it prejudicially affected the defendant's substantial rights. *State v. Cornwell*, 86 Ohio St.3d 560, 570, 715 N.E.2d 1144 (1999). The Ohio Supreme Court has held that the conduct of a prosecuting attorney during trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial. *State v. Apanovitch*, 33 Ohio St.3d 19, 24, 514 N.E.2d 394 (1987).

{¶50} Hsu argues that the prosecutor committed misconduct by repeatedly cross-examining him about his statement and the clarification of a sentence in his statement to Officer Wells. "Prosecutors have wide latitude in cross-examining witnesses subject to the court's discretion." *State v. Brown*, 2d Dist. Montgomery No. 24541, 2012-Ohio-1848, ¶ 22; *State v. Ellington*, 8th Dist. Cuyahoga No. 84014, 2004-

Ohio-5036, ¶ 36. On cross-examination, the prosecution may properly test the credibility of an accused regarding a matter which the accused testified to upon direct examination. *See State v. Gest*, 108 Ohio App.3d 248, 257-258, 670 N.E.2d 536 (8th Dist.1995).

{¶51} Here, the record reflects that Hsu was being evasive on cross-examination in answering the prosecutor's questions about his statement to Officer Wells and his clarification of that statement on direct examination. Although his attorney objected to parts of the questioning of which Hsu complains, the trial court overruled the objections, stating that Hsu was being vague and not directly answering the prosecutor's questions. Contrary to Hsu's assertions, the prosecuting attorney was entitled to question Hsu regarding conflicts in his statement to Officer Wells and his statement at trial. Based on our review of the record, we cannot conclude the prosecutor's conduct on cross-examination was unnecessarily harassing or argumentative. *See Brown* at ¶ 23. Hsu's case, moreover, was tried to the court, not a jury, so his assertion that he was denied a fair trial because the trier of fact was somehow misled by this questioning is not well taken. We find no error in the prosecutor's cross-examination of Hsu.

{¶52} Hsu also argues that the assistant prosecutor committed misconduct when he stated he "believe[d] that Holthaus was a credible witness, who was polite and truthful." Because Hsu did not object to the prosecutor's remark during closing argument, we must review the alleged misconduct for plain error. *State v. Shalash*, 1st Dist. Hamilton Nos. C-130748 and C-130749, 2014-Ohio-5006, ¶ 45-46. Thus, to reverse his conviction, we must be convinced that Hsu would not have been convicted, but for the prosecutor's comment. *See id.; State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 50.

{¶53} We agree with Hsu that the prosecutor's comment was improper. Prosecutors must not express their personal beliefs or opinions regarding the credibility of witnesses. *See State v. Simmons*, 2014-Ohio-3695, 19 N.E.3d 517, ¶ 77 (1st Dist.); *State v. Combs*, 1st Dist. Hamilton No. C-120756, 2013-Ohio-3159, ¶ 14; *State v. Harriel*, 1st Dist. Hamilton No. C-040771, 2006-Ohio-2616, ¶ 31. However, " '[i]n a bench trial, the trial court is presumed to rely only on relevant, material evidence in arriving at its conclusion.' " *State v. Ushry*, 1st Dist. Hamilton No. C-050740, 2006-Ohio-6287, ¶ 47, quoting *State v. Lane*, 108 Ohio App.3d 477, 484, 671 N.E.2d 272 (1st Dist.1995); *see State v. Fox*, 69 Ohio St.3d 183, 189, 631 N.E.2d 124 (1994) (holding that a trial judge is presumed to consider only materially admissible evidence). Here, there is nothing in the record to indicate that the trial court relied on the prosecutor's statement during closing argument in finding Hsu guilty of the offense. We, therefore, refuse to find plain error where there has been no demonstration that prosecutorial misconduct affected the result of the trial. Consequently, we overrule Hsu's third assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

**HENDON** and **STAUTBERG, JJ.,** concur.

Please note:

The court has recorded its own entry this date.